J-A29017-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JACOB C. PENZERRO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JULIA B. GADD | : | |
| | : | |
| Appellant | : | No. 898 WDA 2021 |

Appeal from the Order Entered July 12, 2021
In the Court of Common Pleas of Mercer County Civil Division at No(s):
2019-00074

BEFORE:  BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

DISSENTING MEMORANDUM BY PELLEGRINI, J.:     **FILED: March 15, 2022**

Julia B. Gadd (Mother) appeals the order of the Court of Common Pleas

of Mercer County (trial court) denying her request to relocate with her

daughter, L.C.P., from Brookfield, Ohio, to Cambridge Springs in Crawford

County, Pennsylvania.  L.C.P. was born in January 2015 to Mother and Jacob

C. Penzerro (Father) who were never married.

In a request for relocation and attendant custody proceeding, the

ultimate goal is to determine what is in the best interest of the "child's

physical, intellectual, moral, and spiritual wellbeing." ***Saintz v. Rinker***, 902

A.2d 509, 512 (Pa. Super. 2006) (citation omitted).  To determine whether

relocation is in the best interest of the child, the trial court must consider the

_____

[*] Retired Senior Judge assigned to the Superior Court.

ten factors set forth in Section 5337(h) of the Child Custody Act, 23 Pa.C.S. § 5337(h). Those factors recognize that there are at least three interests to be considered in making that determination: the father's, the mother's and the child's. If either father or mother has remarried or intends to remarry, there will be a step-parent or soon-to-be step-parent, and possible half-sibling(s), who are relevant to the best interests of the child. Moreover, the interests of the adults are not peripheral to the best interests of the child because failing to consider the adults' best interests can rarely be in the child's best interest.

I respectfully dissent because the trial court erred by:

- not addressing what was before it—whether Mother's specific request to relocate to Cambridge Springs was in the best interest of L.C.P.—because it believed that a relocation to somewhere else would be better;

- not taking into consideration the interest of all the parties as required by Section § 5337; and

- reaching factual conclusions not supported by the evidence.

**I.**

The underlying facts are not in dispute. Mother's proposed relocation with L.C.P. from Brookfield, Ohio, to Cambridge Springs was to live with her fiancé (Fiancé), the father of her then soon-to-be born child. Father resides in West Middlesex, Pennsylvania, which is a thirty-minute drive from where Mother now lives. Cambridge Springs is a seventy-five-minute drive from Father's house.

Mother and Father do not interact well. "[F]ather has a history of anger issues and inappropriate interactions with [M]other, by way of example: 1. Father was found guilty of aggravated menacing; 2. Father broke a door open and broke a television next to [M]other[.] Both parties agree communication between them is not very good, often ending in arguments." Trial Court Opinion, 7/12/21, at 4.

Mother has no family in Brookfield or Cambridge Springs. Fiancé has lived in Cambridge Springs his whole life and his entire extended family lives within fifteen minutes of his home. Father's brother and sister-in-law and their four children, who are between two and seven years of age and with whom L.C.P. interacts, live in Brookfield, about ten minutes from where Mother now lives. When L.C.P. was asked how she would feel if she would see her Father less than she currently does, she said would be a "little sad." Trial Court Opinion, 7/12/21, at 3.

Overarching all the other considerations in this case is L.C.P.'s medical condition. She has been diagnosed with Friedreich's Ataxia (FA) and left ventricular hypertrophy. FA is a progressive disease for which there is currently no known treatment. She currently has balance problems, fatigues easily and wears orthotic braces on her ankles. FA results in a lower life expectancy of approximately thirty-five years, and in the next five years, will likely result in her requiring a wheelchair. L.C.P. receives physical and occupational therapy in Brookfield, with a private therapist in Howland, Ohio,

and at school. "[M]other has provided, almost exclusively, all care with regard to child's diagnosis and neurological disorder." Trial Court Opinion, 7/12/21, at 7 (emphasis omitted).

As a result of L.C.P.'s condition, Mother will have to eventually move because she lives in a single trailer that cannot be modified when L.C.P. requires a wheelchair. However, both Fiancé's home in Cambridge Springs and Father's home are suitable, with adaptions, for L.C.P. once she requires a wheelchair.

Because of schooling and distance involved from Father's and Mother's relocated residence, the existing custody arrangement would be impractical. Under the current "5-2, 2-5" arrangement, Mother has L.C.P. Monday and Tuesday, Father Wednesday and Thursday morning, and they alternate Thursday through Monday. Mother proposed a new physical custody schedule where Father would have custody three weekends per month during the school year and alternating weeks during the summer.

**II.**

In denying relocation, the trial court found that none of Section § 5337(h)'s ten relocation factors favored relocation. Permeating the trial court's analysis in arriving at that conclusion were (1) where L.C.P. received medical and physical therapy treatment, and (2) Fiancé's testimony that he was willing to explore moving to a more central location so that the current custody arrangement could be maintained.

In addressing the impact of relocation on L.C.P.'s physical, educational and emotional development and considering her special needs,[1] the trial court found that factor "strongly favors disallowing relocation." Trial Court Opinion, 7/12/21, at 12. It reasoned that L.C.P.'s condition "will most likely result in the child being wheelchair bound [and] child's neurologist, at Akron Children's Hospital, [is] one (1) hour from the child's current location and one (1) hour and forty-five (45) minutes from the proposed relocation. The child's current primary care physician and therapists are all within fifteen (15) minutes of the child's current residence." *Id.*

The trial court considered Fiancé's purported willingness to move to a more central location as relevant under several Section 5337(h) factors:

- In addressing the factor regarding the feasibility of maintaining the relationship between the non-relocating party and the child,[2] the trial court found that it disfavors relocation because the current 50/50 custody agreement could not be maintained. It noted that Fiancé has indicated a willingness to relocate and it believed a different proposed relocation may be "possible."[3] Trial Court Opinion, 7/12/21, at 12-13.

---

[1] 23 Pa.C.S. § 5337(h)(2).

[2] 23 Pa.C.S. § 5337(h)(3).

[3] The trial court suggested that relocation halfway between where Father now resides and Cambridge Springs may be possible. However, L.C.P. would then not have close contact with Father's family, which the trial court deemed to be important in considering the Section 5337(h)(1) analysis regarding other significant people in L.C.P.'s life. It also did not consider that the potential for other significant relationships may develop with Fiancé's family or, in the long run, her most significant relationship—her newborn sibling. Furthermore, such a relocation would also increase the travel time to Akron Children's

- In reviewing the factor of whether the relocation would enhance the general quality of life for the party seeking relocation,[4] the trial court found that Mother's financial and educational circumstances would improve based on the relocation. Nonetheless, it found this factor neutral largely because Fiancé "could move more in the middle of his location and [M]other's current location, he would be willing to do so, and there would be no financial burden on him doing so." Trial Court Opinion, 7/12/21, at 14.

- In reviewing whether relocation would enhance the quality of life for the child,[5] the trial court found that factor neutral. It found that relocation "would benefit the child to the extent there would be a bigger home, the ability to make the home wheelchair accessible, and the efforts are already undertaken at [F]iancé's current home to modify the house, and surrounding area, for the child." Trial Court Opinion, 7/12/21, at 14. Nonetheless, it concluded that L.C.P.'s medical condition somehow "strongly mitigates against relocation," again solely because Fiancé was willing to relocate, "mitigating the need for a move to Cambridge Springs." *Id.*

Unlike the majority, I would find that that the trial court abused its discretion when analyzing the relocation factors by weighing the factors improperly and relying on improper factors. Thus, I would conclude that the trial court committed an error of law by denying relocation based on where

---

Hospital and a change in primary care physicians and physical therapists discussed *infra*.

[4] 23 Pa.C.S. § 5337(h)(6).

[5] 23 Pa.C.S. § 5337 (h)(7).

L.C.P. received medical treatment and Fiancé's purported willingness to move.[6]

## III.

## A.

There is no evidence that supports the trial court's conclusion that where L.C.P. receives medical treatment and physical therapy strongly favors disallowing the relocation. It reached this conclusion because the drive from Cambridge Springs to Akron Children's Hospital would take an additional forty-five minutes compared to Mother's home in Brookfield. Mother testified that since being referred, L.C.P. had been to Akron Children's Hospital four times, including her first appointment in February 2020. *See* N.T. Hearing, 5/28/20, at 24. When asked about how many appointments L.C.P. had over the preceding year with both her specialists in Akron and her local primary care physician, Mother responded "several." *See* N.T. Hearing, 6/07/21, at 18.

---

[6] Contrary to the majority's comments, the dissent is not attempting to reweigh the evidence, nor perform a new balancing test or scour the record in an effort to reverse the trial court's decision. It accepts all the facts found by the trial court but rejects the conclusions the trial court draws from those facts as unreasonable. The dissent does not have to scour the record for reasons to reverse the trial court; it merely addresses the two reasons that the trial court relied on in denying relocation and finds them to be improper. While the majority may disagree with the dissent's analysis of those two issues, it is still within our ken as a reviewing court to address these reasons and remand if we find the trial court's analysis legally improper. Simply, that is what we must do when reviewing a trial court decision; otherwise, taking an appeal would be an exercise in futility.

She testified that she only goes to the neuromuscular clinic at Akron Children's Hospital once every six months. *See id.* For such a limited number of appointments, the extra 45 minutes are so insignificant that the trial court abused its discretion by finding this consideration militated against relocation.[7]

The trial court also considered that L.C.P.'s primary care physician and physical therapists in Howland, Ohio, are all within fifteen minutes of her current residence. The import of the consideration is that L.C.P. would adversely be affected if she obtained a new primary care physician and new physical therapists. Nothing in the record supports that factual conclusion.

First, there is almost no testimony in the record regarding her physical therapy, other than she attends two months on and two months off, while her occupational therapy is every other week. *See id.*, at 21. There is no evidence that those physical therapists are so unique, so skilled, that other licensed physical therapists could not provide the same treatment. Nothing suggests that there are no equally accomplished primary care physicians or physical therapists available in Cambridge Springs or nearby Meadville.

---

[7] Contrary to the majority's assertions, the dissent does not ignore that L.C.P. previously completed the trip to Akron four times in a four-month period. That fact is simply irrelevant because that trip now only occurs twice a year. The reduced number of appointments in Akron does, however, diminish the trial court's finding that the added forty-five minutes in her biannual trip has any deleterious effect. There is no evidence in the record that an extra forty-five minutes a year would cause additional hardship, and it was an abuse of discretion for the trial court to so conclude.

- 8 -

Second, there is no guarantee that those medical professionals, either provided through the school or a private provider, will be available forever in Howland. They could be transferred, quit or change employers. Simply, there is nothing in the record that supports the factual conclusion that continuing with L.C.P.'s current medical providers strongly militates against relocation. For the trial court to find that this factor strongly disfavors relocation was an abuse of discretion.[8]

**B.**

Now as to the trial court's findings, mentioned above, that rely on Fiancé's purported willingness to move closer to where Father lives as a factor

---

[8] The majority contends that the dissent's analysis simply challenges the weight which the trial court placed upon the facts. No, it doesn't. As the majority itself notes:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings, and thus, represent a gross abuse of discretion.

**R.M.G., Jr. v. F.M.G.**, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting **Bovard v. Baker**, 775 A.2d 835, 838 (Pa. Super. 2001)). The trial court's factual finding that it would cost an extra forty-five minutes every six months to go to Akron Children's Hospital does not support the conclusion that the distance is so burdensome that it militates against relocation.

against relocation. Mother, in accordance with Section 5337(c), served Father with a notice of proposed relocation to a specific address in Cambridge Springs. In making the determination as to whether relocation should be permitted, the trial court is limited to applying the Section 5337(h) factors to the move to the proposed specific location without regard to any speculative relocation that it suggests may be acceptable. Because it did not confine its analysis to whether Mother's proposed relocation to Cambridge Springs was in the best interest of L.C.P. but, instead, found that some speculative location may be better, the trial court committed an error of law.

The trial court erred in speculating about an alternative relocation to determine whether the requested relocation was in the best interest of L.C.P. For example, the trial court found that Mother's financial and educational circumstances would be improved by relocation, but then nonetheless found that this factor was neutral because Fiancé was willing to relocate and ultimately concluded that relocation was disfavored simply because Fiancé expressed a willingness to move. *See* Trial Court Opinion, 7/12/21, at 13-14, 16. However, Section 5337(h)(6) only directs the trial court to consider whether Mother's general quality of life would improve because of the relocation to that specific location. *See* 23 Pa.C.S. § 5337(h)(6).[9] Even

_____

[9] *See* 23 Pa.C.S. 5337(h)(6) ("In determining whether to grant a proposed relocation, the court shall consider … [w]hether the relocation will enhance

- 10 -

though the trial court recognized that it would, it stated that it did not matter because Mother could also move to some other unknown and unapproved location. It was improper for the trial court to use this speculative consideration as an "offset" when the simple answer under that factor is that relocation would be in Mother's best interest. By introducing Fiancé's purported "willingness to move" to find this factor neutral rather than in favor of relocation, the trial court abused its discretion because Fiancé's willingness to move is irrelevant to whether Mother's circumstances would improve through the relocation, the sole focus of that factor.

Further, using Fiancé's "willingness to move" to a more central location is an improper consideration for the trial court to rely on to deny relocation because Fiancé had to consider what was going to happen if the request for relocation was denied. Moving to a more central location would impose a hardship and obviously was not what Mother and Fiancé wanted. Such a move would require selling Fiancé's present home, moving away from his family, a much-increased commute to work as he now works fifteen minutes away from his home, and buying a new house that is suitable for L.C.P.'s needs, all with a new baby in the house. It may prove necessary, but that does not mean that it is better for L.C.P., and while it may offer an easy way out to resolve a

_____

the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.").

difficult matter, it is an extreme hardship for Mother and Fiancé. "What if" arrangements should be excluded from consideration much for the same reason that changes made after an accident can't be introduced to prove negligence.[10]

Moreover, of course Fiancé would testify that he would consider moving—what choice did he have? If he said that he would not move if relocation was not granted, that would leave Mother in a no-win situation; she would either leave behind L.C.P. to be with her newborn or leave her fiancé to be a single parent to both L.C.P. and the newborn, possibly engaging in another custody battle where the best interests of that child would be involved. Accordingly, I would remand for the trial court to make a relocation analysis without using those improper considerations identified above.

_____

[10] The majority contends that this reasoning is somewhat conjectural. No, it's not. It is hardly speculative to conclude that relocating to an alternative site, that the trial court said it may or may not approve, might potentially affect Mother and Fiancé adversely when (1) they don't want to move, (2) will have to relocate where they know no one, (3) with a new baby and a child with special needs, and (4) a long commute to work. Furthermore, Fiancé explored alternatives because it is simply prudent in such a situation. To use another analogy, even though people stock up on supplies and board their windows if a hurricane is forecast, they hope it is all for naught. The trial court used their prudent actions against them. They would have been better served to not make those "just in case" plans, which would leave L.C.P.'s medical treatment as the only factor that the trial court could rely on to deny relocation.

## C.

Finally, I would also remand for the trial court to make a custody and relocation analysis taking into consideration the overall best interests of L.C.P. and her medical condition. Just because the present custody arrangement is preserved does not mean that it was in the best interest of the child. That determination must be based on all the statutory factors for relocation and custody, including the interests of all the parties. Rather than do what was in the best interest of the child by taking into consideration the interests of all the parties, the majority and the trial court's primary goal appears to be to preserve that present custody arrangement. Simply, Father does not have a right to the present custody arrangement and there is no evidence that under the proposed custody arrangement that Father's relationship with the Child will suffer. In light of Mother's impending marriage and new child and L.C.P.'s medical condition, it may be that her best interests are not served by the present custody arrangement when all of the various interests are taken into consideration.

In preserving the current custody arrangement, not only did the trial court not properly consider whether it will continue the bond L.C.P. has with her Father, it did not examine whether it would be sustainable in the not-too-

distant future.[11]  L.C.P. fatigues easily, will soon need a wheelchair, and as time goes on, presumably will need more aid in her daily life, requiring additional changes in custody during the school week and when she receives therapy, even if there was no relocation.  Mother testified that she could stay at home full-time if necessary, but Father depends on his mother for child care when he is working.  In arriving at a custody schedule, the trial court should

_____

[11] The majority criticizes the dissent's position that on remand, the trial court should attempt to fashion a more sustainable custody arrangement by considering the interests of all the parties.  It accuses the dissent of losing sight of the "polestar" in custody cases to determine what serves the best interest of the child.  *See* Majority Memorandum at 12 n.4.  Moreover, it posits § 5337(h) does not require consideration of all the parties' respective interests "beyond any derivative effects those interests might have on L.C.P."  *Id.* at 13 n.5.  Of course, the best interest of the child is the polestar, but that is a legal conclusion that must be based on the proper analysis of the custody and relocation factors.  If that legal conclusion is not based on proper factors or relies on unsupportable factual conclusions, the best interest of the child is not served.

In determining whether to grant relocation or modify custody, the trial court should have considered the "facts on the ground," which are decidedly different than what Mother and Father agreed to when they agreed to joint custody.  Since that time, L.C.P. was diagnosed with FA, which will lead to the effects mentioned above.  Given the lasting impact the denial of relocation will have on Mother, Fiancé and her soon-to-be-born child, it is prudent that this new reality be taken into consideration when determining what custody should be in the not-too-distant future.

The trial court's denial based on the suggestion that Mother should move somewhere between where Father now lives and Father's work is a solution that allows the present custody arrangement to be maintained, but denies Mother the ability to have Fiancé's family near or for him or his family to help her in the care of L.C.P.  That is why it is necessary to take into considerations the interest of **all** the parties: their interests have derivative effects that determine what is in the best interest of the child.

take all of this into consideration; it may be that a custody schedule closer to what Mother proposed is more sustainable than the present arrangement and in the best interests of the child.

For the foregoing reasons, I respectfully dissent.